IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARCOS SANTIAGO,    :
           :
    Plaintiff,   :   CIVIL NO. 4:CV-08-0102
           :
   v.       :   (Judge McClure)
           :
ASSISTANT WARDEN EY, *et al.*, :
           :
    Defendants.   :

**<u>MEMORANDUM</u>**

April 10, 2009

Plaintiff Marcos Santiago ("Plaintiff" or "Santiago"), an inmate confined at the United States Penitentiary at Allenwood ("USP Allenwood") in White Deer, Pennsylvania, initiated this *pro se* civil rights action pursuant to the provisions of 28 U.S.C. § 1331. Presently before the Court is Defendants' motion to dismiss and for summary judgment. (Record document no. 28.) For the reasons set forth below, the motion will be denied.

**BACKGROUND**

On January 16, 2008, Santiago filed his Complaint alleging that Defendants were deliberately indifferent to his serious medical needs. (*See* Record document no. 1.) Named as Defendants are the following employees of USP Allenwood: William Ey, Jr., Assistant Warden; Dr. Calvin Vermeire, former medical officer; Kelley

DeWald, Assistant Health Administrator; Jennifer Holtzapple, Physician Assistant ("PA"); and John Doe, medical department employee.  In the Complaint, Santiago alleges that, beginning in August 2006, he started having episodes of severe head pain and pressure, particularly in the back of his head, and he eventually was diagnosed with sinusitis.  He alleges that from September 2006 through January 2008, Defendants were deliberately indifferent to his serious medical needs when they failed to properly diagnose him.  He claims that, despite his numerous requests, Defendants Vermeire and Holtzapple failed to obtain the results of his April 18, 2007 MRI until approximately June 27, 2007, thus delaying his diagnosis of sinusitis based on those results.  (*See* Record document no. 1 ¶¶ 48-62.)  Santiago further alleges that Defendants Holtzapple, DeWald, and Ey were deliberately indifferent when they ignored him after he informed them that he was unable to purchase the medication that Holtzapple had directed him to take from the commissary to treat his sinusitis because his inmate account was frozen.  (*See id.* ¶¶ 62-66.)

Service of the Complaint was directed by Order dated February 4, 2008. (Record document no. 9.)  Following a motion for an extension of time to file an answer to the complaint, which was granted, on May 22, 2008, Defendants filed the instant motion.  (*See* Record document nos. 20, 22, 28.)  On May 30, 2008,

Defendants filed a supporting brief (Record document no. 32), statement of facts (Record document no. 33), and supporting declarations and exhibits (Record document nos. 33-2, 33-3.)  On July 14, 2008, Plaintiff filed his brief in opposition (Record document no. 40) and affidavit (Record document no. 39) responding to the declarations submitted by Defendants.  Defendants filed a reply brief on July 25, 2008.  (Record document no. 41).  Accordingly, the motion is ripe for consideration.

**STANDARD OF REVIEW**

It is appropriate for a court to grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "Material facts" are those which might affect the outcome of the suit.  *Id.*; *Justofin v. Metropolitan Life Ins. Co.,* 372 F.3d 517, 521 (3d Cir. 2004).

A party seeking the entry of summary judgment bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The moving party can

discharge that burden by "'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party meets its burden of showing an absence of genuine issues of material fact, the nonmoving party must provide some evidence that an issue of material fact remains. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). However, the nonmoving party cannot do so merely by offering general denials, vague allegations, or conclusory statements; rather, the party must point to specific evidence in the record that creates a genuine issue as to a material fact. *Celotex*, 477 U.S. at 324; *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999).* In evaluating a motion for summary judgment, the court will draw all reasonable inferences from the evidence in the record in favor of the nonmoving party. *Am. Flint Glass Workers Union v. Beaumont Glass Co.,* 62 F.3d 574, 578 (3d Cir. 1995).

In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Further, "[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Id.* at 255.

**DISCUSSION**

In support of their motion, Defendants submitted the declarations of Defendants Holtapple, Vermeire, Ey, and DeWald.  (Record document no. 33-2, 33-3.)  They argue that Santiago received consistent and appropriate medical care for his complaints and that he merely disagrees with the care he was given.  (*See* Record document no. 32, Defendants' brief, at 11-21.)  Defendants also contend that when Santiago informed Defendant DeWald that he could not purchase over-the-counter medications at the commissary due to a disciplinary violation, she told him that he still could buy these medications pursuant to BOP Program Statement 6541.02, Over the Counter Medications.  (*Id.* at 9; Record document no. 33-3, DeWald declaration, at 29, ¶ 11.)

Defendants argue that Defendants Ey and DeWald are entitled to summary judgment because they did not have any direct involvement or acquiescence in the alleged constitutional misconduct.  (*See id.* at 8-11.)  Finally, Defendants argue that Defendant Doe should be dismissed as a party to this action because he has not been served with the Complaint, and thus the Court lacks personal jurisdiction over him.

5

(*See* Record document no. 32 at 5-7.)  In opposing Defendants' motion, Santiago

submitted an opposition brief (Record document no. 40) and his own affidavit in

opposition to the declarations submitted by Defendants (Record document no. 39).

The Court has reviewed all of the submissions by both parties and will address each of

Defendants' arguments in turn.

## I.      Deliberate Indifference Claim

In order to establish an Eighth Amendment claim against a defendant for

inadequate medical care under § 1983, a plaintiff must show "(I) a serious medical

need, and (ii) acts or omissions . . . that indicate deliberate indifference to that need."

*Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).  *See also*

*Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  A serious medical need is one

that has been diagnosed by a physician as requiring treatment, or one that is so

obvious that a layperson would recognize the need for a doctor's attention.  *Monmouth*

*County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).  In addition,

"if 'unnecessary and wanton infliction of pain' results as a consequence of denial or

delay in the provision of adequate medical care, the medical need is of the serious

nature contemplated by the eighth amendment."  *Id.* (quoting *Estelle v. Gamble*, 429

U.S. 97, 103 (1976)).

The test for whether a prison official was deliberately indifferent is whether that defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 841 (1994).  "The official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.  Thus, a complaint that a physician "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment . . . ." *Estelle*, 429 U.S. at 106.

The allegations that Santiago makes about the severe and debilitating head pain that he experienced are serious in nature.  He alleges that on multiple occasions, the pain was so severe that he was unable to get out of bed to eat meals or was forced to lie on the floor in an attempt to ease the pain.  (*See* Record document no. 1 ¶¶ 16, 22, 25, 26, 28, 30, 32, 45.)  The record reveals that Defendants attempted to evaluate the source of this head pain, but there are genuine issues of material fact as to whether they were deliberately indifferent to Santiago's serious medical needs.  The relevant facts are as follows:

Santiago arrived at USP Allenwood on June 21, 2005.  (Record document no. 33, Defendants' statement of material facts, ¶ 1.)  PA Holtzapple evaluated Santiago

7

upon his arrival and noted that he had a history of depression, bipolar disorder, and suicide attempts.  (*Id.* ¶ 2.)  He was a Care Level I inmate with no known drug allergies or medications.  (*Id.* ¶ 3.)  Therefore, he was assigned to a regular housing unit.  (*Id.* ¶ 4.)  On August 31, 2005, Santiago was seen during the mental health chronic care clinic for an initial evaluation.  (*Id.* ¶ 5.)  At that time, Santiago informed staff that he did not have any current problems with anxiety or depression.  (*Id.* ¶ 6.) He declined to take antidepressants and therefore was discontinued from the clinic. (*Id.* ¶ 7.)  On November 22, 2005, Santiago was seen by medical staff at which time he complained of dandruff and body aches.  (*Id.* ¶ 8.)

Sometime in the month of August 2006, while Santiago was eating a plate of food in his friend's cell, he "suddenly experienced an intense rush beginning in his neck and quickly making its way up to [his] brain."  (Record document no. 1 ¶ 13.) He immediately put the bowl down and leaned back in his chair.  (*Id.*)  His friend gave him water, which he drank.  (*Id.*)  After about fifteen (15) minutes, Santiago walked slowly back to his cell.  (*Id.*)  He felt the pressure in his head rise the longer he was standing.  (*Id.*)  After he opened his cell door, he clumsily collapsed onto his chair, and the cup he was holding collapsed to the ground.  (*Id.*)  Upon realizing that something was wrong with him, Santiago's cell mate, Darryl Smith, immediately left

the cell and called the guards.  (*Id.*)  When the guards arrived at the cell and asked Santiago if he wanted them to call for medical help, he believed he would be alright and politely declined.  (*Id.*)  Santiago then went to bed.  (*Id.*)

For the next few weeks after the above incident, Santiago began experiencing pain in his chest area which caused him to have to walk "very slow."  (*Id.* ¶ 14.)  He also experienced "pain in his head, like pressure, especially in the back of his head." (*Id.*)  He brought these symptoms to the attention of the psychologist, Mrs. Turgovac, and she responded that she believed that he was suffering from anxiety and was "not about to have a heart attack."  (*Id.* ¶ 15.)  Santiago took her word for it and went about his business.

On September 8, 2006, while Santiago was typing in the law library, he began to experience "a rush to his head again and stiffness in his neck, which caused [him] to have to lie down on the floor in order to relieve the mounting pressure in his head." (*Id.* ¶ 16.)  At approximately 7:40 p.m. on that date, he was seen by a paramedic as an "emergency visit" in the Health Services Unit ("HSU").  (Record document no. 33 ¶ 9.)  Santiago reported that he had experienced a "'rush' feeling in his head and neck." (*Id.* ¶ 10.)  He stated that these episode occurred after he ate foods with a lot of sodium in them, except for that night's episode.  (*Id.* ¶ 11)  He denied nausea,

9

shortness of breath, chest pain, weakness, and abdominal pain. (*Id.* ¶ 12.)  Upon examination, Santiago was ambulatory; his skin was pink, warm, and dry; his pupils were equal, round, and reactive to light; his lungs were clear; and his abdomen was soft and no-tender and without masses. (*Id.* ¶ 13.)  He had equal pulses, sensation, and movement; equal hand grasps; no facial droop; no arm drift or drop; and his blood sugar, level of oxygen in his blood, heart rate, and respiration all were normal. (*Id.* ¶ 14.)  However, his blood pressure was slightly elevated. (*Id.*)  nothing significant was observed regarding Santiago's heart rate. (*Id.* ¶ 15.)  By 8:00 p.m., Santiago was symptom free. (*Id.* ¶ 16.)  He was instructed to avoid foods with a high sodium level and to follow up by attending sick call if his symptoms returned. (*Id.* ¶ 17.)  He also was instructed to sign up for sick call on September 11, 2006, but he did not appear. (*Id.* ¶¶ 18, 19.)

On December 15, 2006, Santiago again was seen by a paramedic in the HSU on an emergency basis. (*Id.* ¶ 21.)  Santiago complained of intermittent chest pain, shortness of breath, and a "rush feeling" for the past two to three days that decreases or stops with strenuous exercise. (*Id.* ¶ 22.)  Upon examination, he was ambulatory; his skin was warm and dry; his nail beds were pink and capillary refill was normal; and his lungs sounded clear and bilateral. (*Id.* ¶ 23.)  While Defendants state that

10

Santiago's blood pressure, heart rate, respiration, temperature and pulse were normal, Plaintiff disputes these findings based on his EKG results from that day which contain the notations, "incomplete right bundle branch block . . . T-Abnormality in high lateral leads . . . ." (Record document no. 39, Plaintiff's affidavit, at 6, ¶ 2; Record document no. 1, Ex. C, 12/15/06 EKG results.)  The notes on Plaintiff's chart indicate that his blood pressure was 122/86 and heart rate was 68 beats per minute.  (Record document no. 33-2, health record, at 39.)  The paramedic determined that Santiago had non-cardiac chest pain and shortness of breath.  (Record document no. 33 ¶ 26.)  Santiago was instructed to follow up at sick call and to return to the HSU as needed.  (*Id.* ¶ 27.)

On February 1, 2007, PA Holtzapple saw Santiago in the HSU on an emergency basis.  (*Id.* ¶ 28.)  Santiago complained that when he eats sodium, his neck gets stiff. (*Id.* ¶ 29.)  He further stated that he was dizzy earlier in the day as he walked to work and noted that his family has a history of diabetes.[1]  (*Id.* ¶ 30.)  PA Holtzapple examined Santiago and determined that he was ambulatory with no signs of distress. (*Id.* ¶ 31.)  He reported pain as a level one on a scale of one to five.  (*Id.*

_____

[1]Santiago disputes that he ever reported that he was "dizzy," but states that "'dizzy' is a word that medical staff members often chose to write instead of what Plaintiff really told them, which was that Plaintiff was suffering a painful pressure in his head." (Record document no. 39 at 6 ¶ 3.)

11

¶ 32.)  His blood pressure and pulse were within normal ranges, his heart had a regular

rate and rhythm, and his chest was clear.  (*Id.* ¶¶ 33, 34.)  PA Holtzapple noted that it

was a normal examination and she ordered blood work to be performed to check

Santiago for diabetes due to his self-reported family history of diabetes.  (*Id.* ¶ 35.)

On February 17, 2007, Santiago reported to Health Services and complained of

dizziness and that he felt he was going to faint.  (*Id.* ¶ 36.)  The notes on Santiago's

chart reflect that he stated that, while he was walking, he became dizzy and weak.  (*Id.*

¶ 37.)  The notes on Santiago's chart also state that he reported that this "dizzy and

weak" feeling had been happening often and it usually subsides, but this episode was

different because fatigue also accompanied his complaints.  (*Id.* ¶ 38.)  Upon

examination, Santiago was alert in all three axes and his blood pressure, heart rate, and

blood sugar all were normal.  (*Id.* ¶ 39.)  He denied any diarrhea or exertion.  (*Id.* ¶

40.)  He had normal fluid intake and no fever.  (*Id.* ¶ 41.)  The paramedic determined

that there was no known cause for his symptoms at that time.  (*Id.* ¶ 42.)  Defendants

state that Santiago remained in the HSU for approximately ninety (90) minutes before

he reported that he was feeling better and requested to be medically discharged.  (*Id.*

¶¶ 43, 44.)  They also state that he denied any further complaints and returned to his

housing unit.  (*Id.* ¶ 45.)  However, Santiago disputes that he asked to be discharged,

and contends that he asked to be taken to an outside hospital for help, but Defendants refused and told him to return to his unit. (Record document no. 39 at 6 ¶ 3.)

On February 20, 2007, a medical call for assistance was made from Santiago's housing unit. (*Id.* ¶ 46.) Santiago was lying down on the floor and complaining of intermittent headaches, dizziness, and neck pain for the past three (3) months. (*Id.* 47.) While Defendants state that Santiago reported that he was unable to stand up and walk because he was dizzy, he states that he reported that an intense pain in his head prevented him from standing up. (*Id.* ¶ 48; Record document no. 39 at 6 ¶ 4.) Defendants also state that, upon examination, Santiago's blood pressure was slightly elevated, but his pulse and respiration were normal, and an EKG revealed nothing significant. (Record document no. 33 ¶¶ 50, 51.) However, Santiago disputes that the EKG revealed nothing significant and points to the notation on the report that reads "probable left atrial abnormality." (Record document no. 39 at 6 ¶ 4; Record document no. 1, Ex. F, 2/20/07 EKG result.) Defendants state that the paramedic was not able to find anything wrong with Santiago and did not refer him to Dr. Vermeire for further evaluation, but that Santiago was very persistent about not being able to walk and wanting to go to an outside hospital. (Record document no. 33 ¶¶ 54, 55.) While returning to his assigned housing unit, Santiago insisted on getting out of the

13

wheelchair and walking to his cell on his own.  (*Id.* ¶ 56.)  The paramedic did not

observe any ambulation dysfunction at that time.  (*Id.* ¶ 57.)  Santiago states that the

distance between where he got out of the wheelchair and his cell was a "short one"

and that he felt "he would be able to make it to his cell."  (Record document no. 39 at

7 ¶ 4.)

Later in the day on February 20, 2007, after Dr. Vermeire examined Santiago,

he updated Santiago's medical record to reflect that Santiago actually was

complaining of head pain, not headache, he knew the difference between the two, and

he believed the pain was from blood vessels in his head that were damaged from his

prior crack cocaine use.  (*Id.* ¶¶ 58, 59.)  Santiago also reported that he has a lot of

problems with his bipolar disorder.  (*Id.* ¶ 60.)  He appeared alert, in no acute distress,

and oriented in all three axes.  (*Id.* ¶ 61.)  Upon examination, Dr. Vermeire noted that

Santiago's cranial nerves were normal; he had good balance, strength, and motion; his

deep tendon reflexes were equal; no abnormal movements were noted; his retinas

were benign; and his blood pressure was volatile.  (*Id.* ¶ 62.)  Based on the results of

the evaluation and Santiago's ability to ambulate, Dr. Vermeiere suspected that

Santaigo was "malingering for secondary gain" and advised Santiago to return to sick

call with a list of symptoms.  (*Id.* ¶ 63.)

Santiago asserts that around 10:00 p.m. on February 20, 2007, after he got out of his bed to use the bathroom, an "intense pressure" immediately started to build up in his head as he stood, and he had to sit down on his chair.  (Record document no. 1 ¶ 25.)  But, sitting down did not stop the pressure from building in his head, so Santiago had to lie down on the floor of his cell.  (*Id.*)  His cellmate, Darrell Smith, immediately pressed the duress button and yelled out the cell door to the guards.  (*Id.*)  When the guard arrived at the cell and saw Santiago lying on the floor, he quickly left and called for medical help.  (*Id.*)  A minute later, the guard returned and "sorrowfully" informed Santiago that "I just called, but they said that they know you, and that nothing is wrong with you.  They said to fill out a sick call slip in the morning."[2]  (*Id.*)

Santiago alleges that he spent the entire night on the floor of his cell because every time he tried to move, the pain in the back of his head was "excruciating" and he feared that a vein in the back of his head "was on the verge of bursting."[3]  (*Id.*)

---

[2]Santiago states in his Complaint that the employee in the HSU who refused to provide medical assistance on the night of February 20, 2007 is the "John Doe" Defendant in this action.  (Record document no. 1 at 9, n.2.)

[3]Attached to Santiago's Complaint is the affidavit of his cellmate, Darrell Smith, stating that he witnessed Santiago having a medical problem on February 20, 2007, he did not receive the medical help that he requested, and he spent the rest of the

(continued...)

Although the pain and pressure in his head continued, Santiago was able to climb back into his bed around 5:00 a.m.  (*Id.*)

On February 21, 2007, Santiago alleges that his cellmate, Mr. Smith, informed him that Santiago's name was on the call out list for medical.  (*Id.* ¶ 26.)  However, Santiago could not get to the HSU without a wheelchair, so Mr. Smith informed Defendant Assistant Warden Ey that Santiago needed a wheelchair.  (*Id.*)  Santiago alleges that Ey took no action, and he spent the entire day in bed unable to eat because the extreme pressure in his head prevented him from walking.  (*Id.*)  Defendant Ey does not recall being approached by an inmate and being asked to provide a wheelchair for Santiago on February 21, 2007.  (Record document no. 33 ¶ 71.)  However, he would have directed the inmate to the HSU for medical care, or, if it was an emergency, he immediately would have contacted the Control Center to request medical assistance.  (*Id.* ¶¶ 73, 74.)

Later in the day on February 21, 2007, Santiago alleges that he got out of bed to use the bathroom, and he again felt an intense pressure in his head and hit the duress button on the wall before lying down on the floor.  (Record document no. 1 ¶ 28.)  The guards called for help, and Santiago was transported to the HSU in a

---

[3](...continued)
night on the cell floor.  (Record document no. 1, Ex. I, Smith affidavit.)

wheelchair.  (*Id.*; Record document no. 33 ¶ 65.)  Defendants state that, on that

occasion, Santiago reported that he had fainted and that he complained of weakness

for one hour.  (Record document no. 33 ¶ 64.)  Santiago disputes that he told anyone

that he fainted, but rather explained that the longer he stood, the more intense the

pressure became in the back of his head, and as a result, he had to lie down on the

floor to relieve the pressure.  (Record document no. 39 at 8 ¶ 7.)  The paramedic who

evaluated Santiago noted that he was alert and oriented in all three axes; his pulse and

respiration were normal; his blood pressure was slightly elevated; and that medical

staff should rule out malingering.  (Record document no. 33 ¶ 66.)  Santiago was

instructed to return to his housing unit and rest, to avoid high salt foods, and to sign

up for sick call if the symptoms persist.  (*Id.* ¶¶ 67, 68.)  Santiago insisted that he

could not walk, and therefore, he was allowed to use a wheelchair to return to his unit.

(*Id.* ¶ 69.)

On February 28, 2007, Dr. Vermeire evaluated Santiago as an "urgent visit"

after he complained of persistent head dizziness and the inability to stand.  (Record

document no. 33-2, Vermeire Decl., at 18-19 ¶ 25.)  Santiago's blood pressure was

normal, but his heart rate was elevated.  (*Id.*)  He showed no orthostatic changes (no

changes as a result of sitting versus lying down).  (*Id.*)  However, because his white

blood cell count was slightly elevated and his deep tendon reflexes were increased, Dr. Vermeire ordered a Magnetic Resonance Angiography ("MRA") to determine if Santiago's arteries were inflamed.  (*Id.*)  He also ordered a twenty-four hour test to rule out a tumor of the adrenal glands.  (*Id.*)

On March 7, 2007, a twenty-four hour urine sample was collected per the test order given on February 28, 2007.  (*Id.* ¶ 26.)

On March 8, 2007, medical staff reported to Santiago's housing unit after Santiago was lying on the floor complaining of dizziness and the inability to walk. (Record document no. 33 ¶ 90.)  The paramedic who evaluated him noted that Santiago's blood pressure, heart rate, and respiration all were within normal ranges. (*Id.* ¶ 91.)  Nothing significant was reported on the EKG.  (*Id.* ¶ 92.)  The paramedic noted that medical staff should rule out malingering or feigning an illness.  (*Id.* ¶ 93.) Santiago was advised to return to his unit and to follow-up with a PA if needed.  (*Id.* ¶ 94.)

On March 12, 2007, Santiago was taken to an outside hospital for an MRA. (Record document no. 33-2, Vermeire decl., at 32 ¶ 28.)  The results of the MRA, which were received by Dr. Vermeire on March 21, 2007, showed a possible abnormality in a deep artery in Santiago's brain.  (*Id.* ¶ 30.)  Because the MRA results

made it difficult to exclude an arterio-venus malformation (an abnormal connection between any veins or arteries) or an aneurysm, Santiago was evaluated by an outside specialist on April 4, 2007.  (*Id.* ¶¶ 30, 38.)  The specialist determined that Plaintiff needed to have an angiogram to rule out an aneurysm and an MRI to evaluate for any mass lesions.  (*Id.* ¶ 38; Record document no. 1, Ex. R, 4/4/07 Neurosurgery Outpatient Notes by David C. Carrington, M.D.)

On April 18, 2007, Santiago had the MRI at an outside hospital.  (Record document no. 33-2, Vermeire decl. at 23 ¶ 43.)  On May 8, 2007, he had an angiogram at an outside hospital, which revealed no evidence of an aneurysm, no arterio-venus malformation, and no vascular abnormalities.  (*Id.* ¶ 44.)  Santiago alleges that, after the angiogram, he asked the medical personnel who performed the test for the results of his earlier MRI, but was told that he would need to obtain those results from the prison medical service because they have the records.  (Record document no. 1 ¶ 49.)

On May 15, 2007, Santiago filled out a sick call request complaining about continuing head pain.  (Record document no. 33-2 at 24 ¶ 45.)  On May 16, 2007, Santiago was seen by the psychiatrist at the mental health chronic care clinic.  (*Id.* 46.)  Santiago refused to address the issue that his symptoms are or may be the result of

anxiety even though he was told that "recent medical tests were negative." (*Id.*)  As a result, Santiago's medication was discontinued, and he was discontinued from the clinic.  (*Id.*)

On May 18, 2007, Santiago was seen by Defendant Holtzapple, who explained that his angiogram was normal.  (*Id.* at 6 ¶ 13.)  Santiago disputes that the angiogram was the only topic discussed at this visit, but rather contends that he also asked Holtzapple what the MRI revealed, and she said that it did not reveal anything, and that "It was inconclusive and that's why they had to take the angiogram."  (Record document no. 39 at 2 ¶ 3.)

When Defendant Holtzapple saw Santiago on May 25, 2007, she attempted to explain that the medical staff was not hiding anything from him and that he does not have an aneurysm.  (Record document no. 33-2, Holtzapple decl., at 7 ¶ 14.)  However, Santiago contends that, on that occasion, when he asked about his MRI results, Holtzapple again stated that it revealed nothing and was inconclusive.  (Record document no. 39 at 3 ¶ 4.)

On or about June 25, 2007, Santiago was seen by Defendant Holtzapple after he filled out a sick call request stating that, while his angiogram ruled out vascular lesions, his MRI, the results of which he was being denied, reveals mass lesions in his

brain, and he still was being denied medical attention.  (Record document no. 33-3, health record, at 17.)  Defendant Holtzapple informed him that there was no medical need to see him at that time because he had a "clean bill of health."  (Record document no. 33-2, Holtzapple decl., at 7 ¶ 15.)  Santiago contends that Holtzapple again told him that the MRI revealed nothing.  (Record document no. 39 at 3 ¶ 5.)

Later in the day on June 25, 2007, Dr. Vermeire received a copy of the MRI results from the outside hospital, which showed no mass lesions of the brain and no cerebro vascular abnormality of the brain, but revealed inflammatory changes of some of the sinuses.  (Record document no. 33-2, Vermeire decl., at 28 ¶ 57.)  Santiago attached to his Complaint a copy of the MRI Report, which contains the following findings:

> Findings: The brain shows normal morphology, signal intensity, and volume for age.  No focal parenchymal lesions are seen.  No intracranial hemorrhage, mass effect, hydrocephalus, midline shift, or extraaxial collections are identified.  Diffusion-weighted sequences show no evidence of acute ischemic infarction.  Following administration of IV contrast, no abnormal enhancement is noted.
>
> The pituitary gland, brainstem, and other midline structures are normal in appearance.  The orbits are unremarkable.  There is some sclerosis within the mastoid air cells.  There are inflammatory changes seen within the sphenoid, ethmoid, as well as in the left maxillary sinuses.  The craniovertebral junction is within normal limits.  There are appropriate flow voids in the visualized intracranial vessels.

(Record document no. 1, Ex. Z, 4/18/07 MRI report.)  A notation by Defendant DeWald on Santiago's health record indicates that copies of Santiago's angiogram and MRI results were provided to him on June 28, 2007.  (Record document no. 33-3, health record, at 18.)

On July 2, 2007, Santiago was examined by medical staff on an emergency basis after he complained of a bump on the right side of his head which he believed was an aneurysm.  (Record document no. 33 ¶ 188.)  He also complained of head pain. (*Id.* ¶ 189.)  Upon examination, Santiago's blood pressure, pulse, and respiration all were within normal limits; his head, eyes, ears, nose, and throat were normal; and his eyes were round, equal and reactive to light.  (*Id.* ¶ 190.)  Medical staff observed a small bump on the right side of Santiago's neck which was harder than the other skin areas.  (*Id.* ¶ 191.)  It was non-pulsatile; it appeared superficial to the skin; the skin was warm and dry; and muscular function was normal, with good distal pulses on his hands and feet.  (*Id.* ¶ 192.)  Medical staff determined that, while the bump was of an unknown origin, it was not life-threatening.  (*Id.* ¶ 193.)  Therefore, Santiago was referred to sick call for follow-up.  (*Id.* ¶ 193.)

On July 10, 2007, Defendant DeWald responded to Santiago's written request in which he complained that he was not receiving appropriate medical attention.  (*Id.*

¶¶ 195, 196.)  DeWald was updated on Santiago's medical status by the PA who was

assigned to provide him with medical care.  (*Id.* ¶ 197.)  Based on this information,

DeWald responded to Santiago's request by informing him that his medical tests did

not reveal evidence of an aneurysm, but that he should watch the call out for his name

so that he could be evaluated for sinusitis.  (*Id.* ¶¶ 198, 199.)

On July 11, 2007, Santiago filled out a sick call slip complaining of "inflamed

sinuses which may have in turn infected my mastoid."  (*Id.* ¶ 206.)  He also explained

that he would need medication for his inflamed sinuses because he was unable to

purchase over-the-counter medications at the commissary due to a freeze on his

account.[4]  (*Id.*)  On the same date, he was seen by Defendant Holtzapple, who

explained his MRA and MRI results.  (Record document no. 33-2, Holtzapple decl., at

8 ¶ 17.)  She reviewed Santiago's commissary purchases on the computer and

explained to him that he had not used any antihistamine prior to that date and that he

should try that first.  (*Id.* ¶ 18.)  In his affidavit, Santiago states that July 11, 2007 was

the first time that Holtzapple told him that his sinuses were inflamed, so there was no

_____

[4]In his Complaint, Santiago explains that, after an incident on April 2, 2007
during which he broke a trash can on his unit, the Disciplinary Hearing Officer
ordered that he pay $194.00 to pay for the broken trash can and froze his inmate
account until he paid.  (*See* Record document no. 1 ¶ 62; Ex. Q, 4/2/07 incident
report.)

reason for him to buy sinus pills prior to that date.  (Record document no. 39 at 4-5 ¶ 7.)  Santiago was to be reevaluated in one month.  (Record document no. 33 ¶ 213.)

The facts regarding Santiago's attempts to purchase sinus medication from the commissary are as follows:

Santiago alleges that, on July 12, 2007, he took his written request to the commissary for sinus pills.  (Record document no. 1 ¶ 63.)  When the clerk tried to ring up the pills, he told Santiago "there is some kind of freeze on your account.  I can't touch your money."  (*Id.*)  Santaigo asked him to print a receipt showing that there was a freeze on his account, and the clerk printed a receipt showing that Santiago's account had a balance of $78.34, but that he had an available balance of $0. (*Id.*; Ex. C-1, 7/12/07 receipt.)

In her declaration, Defendant DeWald states that on a date she cannot recall, Santiago approached her and complained that he was not allowed to buy over-the-counter medications because of a disciplinary violation.  (Record document no. 33-3, DeWald decl., at 29 ¶ 11.)  DeWald told Santiago that he still could buy medications such as sinus pills in the commissary pursuant to BOP Program Statement 6541.02, Over the Counter Medications.  (*Id.*)  However, Santiago contends that, on July 18, 2007, he showed DeWald the July 12, 2007 receipt revealing that, while he had a

24

balance of $78.34 in his account, his available balance was $0 such that he was not able to make any purchases in the commissary.  (Record document no. 39 at 20 ¶ 2; Record document no. 1 ¶ 64.)  Further, Santiago contends that Program Statement 6541.2 is irrelevant in his case because it pertains to the purchase of medications by indigent inmates rather than to inmates whose accounts are frozen.  (*Id.* at 21 ¶ 2.) DeWald states that, later that day, she contacted the inmate accounts personnel and was informed that Santiago had enough money in his account to purchase the requested medication, but that the remainder of his account was encumbered "due to pending court fees."  (Record document no. 33-3 at 30 ¶ 13.)  Santiago disputes that he had enough money in his account to purchase the requested medication and points to the receipt showing a $0 available balance as evidence.  (Record document no. 39 at 22-23 ¶ 24; Record document no. 1, Ex. C-1, 7/12/07 receipt.)

Santiago alleges that, on July 19, 2007, after his conversation with Defendant DeWald in which she informed him that he was able to purchase medication from the commissary, he returned to the commissary and requested the medication.  (Record document no. 1 ¶ 65.)  When the clerk attempted to ring up the medication, the clerk again found that Plaintiff's money could not be accessed.  (*Id.*)  Santiago requested another receipt, which shows that he had an account balance of $113.34, but an

available balance of $0.  (*See id.*, Ex. C-1, 7/19/07 receipt.)

Santiago alleges that, around this time, he stopped Defendant Ey in the hallway and brought to his attention that he was unable to purchase medication at the commissary because of a freeze on his account.  (Record document no. 1 ¶ 66.) Defendant Ey recalls Santiago approaching him and that, as Santiago was explaining the issue to him, the Assistant HSU Administrator (DeWald) joined in the conversation and explained that Santiago *was* able to purchase the requested medication from the commissary.  (Record document no. 33-3, Ey decl., at 23-24 ¶ 6.) In his affidavit, Santiago states that Ey failed to mention in his declaration that Santiago showed him the two receipts dated July 12 and July 19, 2007 showing that he tried to buy the sinus medication, but he had a $0 available balance.  (Record document no. 39 at 17 ¶ 2.)  Santiago states that Ey ignored the receipts and instead believed DeWald's explanation.  (*Id.*)

Defendant DeWald states that she overheard Santiago complaining to Ey that he was unable to purchase medication from the commissary because he was on "commissary restriction," and she intervened and explained that she previously informed Santiago that he was able to purchase the medication.  (Record document no. 33-3, DeWald decl., at 30-31 ¶ 16.)  Santiago contends that he interjected by saying,

"But, look at these receipts; they prove that I can't shop," but that Ey and DeWald ignored him. (Record document no. 39 at 17-18 ¶ 2.) Both Ey and DeWald state that Santiago became upset, said that he was going to file a lawsuit, and departed the area without incident. (Doc. 33-3, Ey decl., at 24 ¶ 7; DeWald decl., at 30 ¶ 16.) Santiago explains that he did not attend his August 9, 2007 appointment because the purpose of the appointment was to evaluate how the sinus pills that he had been directed to take on July 11 were working, and he had been unable to buy the sinus pills. (Record document no. 39 at 5 ¶ 8.) However, on August 10, 2007, Santiago purchased some sinus pills after he discovered that he had an available balance of $10.00 in his account. (Record document no. 1 ¶ 67 & n.15.) Santiago points to the receipts from July 12 and 19, 2007 reflecting that he had a $0 available balance on those dates as evidence that this $10 was not previously available. (*Id.* n.15.) On August 27, 2007, Santiago submitted a request to Defendant Holtzapple stating that he continued to experience head pain and requesting to reschedule his August 9, 2007 appointment. (*Id.* ¶ 67.) However, Holtzapple did not respond to the request, and Santiago alleges that he "gave up trying to get any help from USP Allenwood medical service." (*Id.*) In her declaration, Holtzapple states that, to the best of her knowledge, after Santiago did not report to his August 9, 2007 appointment, she did not have any

27

other contact with him regarding the issues he raises in his Complaint.  (Record document no. 33-2, Holtzapple decl., at 8-9 ¶¶ 19, 20.)

In accepting Santiago's allegations as true, and drawing all reasonable inferences in his favor, it is apparent that he has established that there are genuine issues of material fact as to whether Defendants were deliberately indifferent to his serious medical needs.

First, there are genuine issues of material fact as to whether Defendant Doe's failure to respond to Santiago's call for medical help on February 20, 2007 constituted deliberate indifference.  Secondly, there are genuine issues of material fact as to whether Defendants Vermeire and Holtzapple were deliberately indifferent to Santiago's serious medical needs when they failed to obtain the results of his MRI for nearly four months such that his diagnosis of sinusitis was delayed.  Even if the reason that Santiago was sent for the angiogram and MRI was to rule out an aneurysm, and the angiogram showed that he did not have an aneurysm, Santiago continued to complain of head pain.  Taking Santiago's allegations as true, when Santiago continued to complain of head pain, Defendants Holtzapple and Vermeire assured him that the MRI did not reveal anything, and Defendant Holtzapple even told him that he had a "clean bill of health," even though Defendants had not obtained the results of

the MRI.  In his declaration, Dr. Vermeire states that, "Unfortunately, the results of

the MRI were not forwarded to the institution until July 25, 2007, after medical staff

once again requested a copy from the hospital records department."  (Record

document no. 33-2, Vermeire decl., at 31, ¶ 67.)  Defendants do not state when they

previously requested the MRI results or explain why they did not attempt to obtain

them from the outside hospital on the occasions when Santiago requested the results.

Finally, with regard to Santiago's attempts to purchase medication as directed

from the commissary, there are genuine issues of material fact as to whether

Defendants DeWald and Ey were deliberately indifferent to Santiago's serious

medical needs when he informed them that he was unable to purchase the medication

he had been directed to take from the commissary to treat his sinusitis.  In particular,

there is a genuine issue of material fact as to DeWald's assertion that, after Santiago

brought the issue to her attention, she ascertained that he had the money available in

his account to purchase the medications.  According to Santiago, this exchange with

DeWald where she assured him that he had the money available to purchase the

medication took place on July 18, 2007.  Yet, Santiago has produced a second receipt

dated July 19, 2007 showing that, even after he brought the issue to DeWald's

attention and she assured him that he had the available funds, he still had a $0

available balance when he attempted to purchase the medication at the commissary on that date. Because it is inappropriate for this Court to decide the various issues of credibility that are necessary to resolve the genuine issues of material fact that exist at this stage of litigation, Defendants' motion for summary judgment will be denied as to Santiago's deliberate indifference claims. *See Anderson*, 477 U.S. at 255.

## II.  Defendants DeWald and Ey

Defendants argue that DeWald and Ey should be dismissed as parties to this action because Santiago has not alleged any direct involvement by them in the alleged constitutional violations. (*See* Record document no. 32, Defendants' brief, at 8.) They also argue that, to the extent Santiago named DeWald and Ey as Defendants in their capacities as supervisors, *respondeat superior* cannot form the basis of a *Bivens* claim. (*See id.* at 11.)

"A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). However, the personal involvement requirement may be satisfied by a showing of "personal direction or of actual knowledge and acquiescence." *Id.; Pansy v. Preate*, 870 F. Supp. 612, 630 (M.D. Pa. 1994), *aff'd mem.*, 61 F.3d 896 (3d Cir. 1995).

Prison administrators cannot be found deliberately indifferent under the Eighth Amendment because they fail to respond to the medical complaints of an inmate being treated by a prison physician, or because, as non-physicians, they defer to the medical judgment of the inmate's treating physicians.  *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993).  "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner," a non-medical prison official will not be found to be deliberately indifferent.  *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).  Deliberate indifference can be (1) denying reasonable requests for medical treatment that result in undue suffering or the threat of tangible residual injury, (2) delaying necessary medical treatment for non-medical reasons, or (3) providing an easier and less efficacious treatment to the inmate.  *See Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987).

Santiago alleges that Defendant Ey was deliberately indifferent to his serious medical needs when he did not respond to Santiago's cellmate, Mr. Smith's, request for a wheelchair to allow Santiago to attend his medical appointment on February 21, 2007 and when he ignored the receipts that Santiago showed him to prove that he was not able to purchase medication that he had been directed to take from the commissary.

31

As to the wheelchair request, Ey states that he does not recall an inmate approaching him to obtain a wheelchair for another inmate, but that if he had been approached, he would have referred the inmate to the medical department.  (Record document no. 33 ¶¶ 71, 73, 74.)  To respond to Ey's statement, Santiago attached Mr. Smith's affidavit to his opposition brief.  (*See* Record document no. 40, Ex. B, Smith affidavit.)  According to Mr. Smith, when he asked Ey for a wheelchair for Santiago on February 21, 2007, Ey first told him to take it up with the medical department. (*See id.*)  After Smith told Ey that the medical staff not only refused to come and pick up Santiago for his appointment but that they also refused his request for medical attention the night before, Ey refused to do anything about it, so Smith walked away. (*See id.*)

As to the encounter that Santiago had with Ey regarding his inability to purchase medication that he had been directed to take from the commissary, Santiago stated in his affidavit that he showed the receipts to Ey showing that he had a $0 available balance.  Despite seeing these receipts, Ey did not question DeWald's statement that Santiago had the ability to purchase the medication.  (Record document no. 39 at 17-18 ¶ 2.)  Based on this record, genuine issues of material fact exist as to whether Ey was aware that Santiago had a serious medical need for which he was not

32

receiving adequate medical care, and thus Ey will not be dismissed as a party to this action.

As to Defendant DeWald, Santiago alleges that when he was in the HSU on February 28, 2007, he asked to be taken to an outside hospital, and DeWald told him that he was not going anywhere.  (Record document no. 1 ¶ 35.)  DeWald states that she told Santiago that it was up to the institution's medical officer to make that determination based on his professional experience.  (Record document no. 33-3, DeWald decl., at 28 ¶ 9.)  These allegations alone are insufficient to establish deliberate indifference on the part of DeWald.  However, Santiago has established that genuine issues of material fact exist as to whether DeWald was deliberately indifferent when she maintained that he had the funds available to purchase medications at the commissary even though Santiago showed her the receipts reflecting that he had a $0 available balance.  Accordingly, DeWald will not be dismissed as a party to this action.

## III.    Defendant John Doe

Defendants argue that Defendant John Doe should be dismissed as a party to this action because he has not been served with the Complaint, and thus this Court lacks personal jurisdiction over him.  (*See* Record document no. 32 at 5-7.)  Although

John and Jane Doe defendants must eventually be dismissed if discovery yields no

identities, fictitious names may be used until reasonable discovery permits the actual

defendants to assume their places.  *See Parker v. United States,* 197 Fed. Appx. 171,

173 n.1 (3d Cir. 2006); *Aponte v. Karnes*, 2008 WL 360879, at *1 n.1 (M.D. Pa. Feb.

8, 2008); *Smith v. Lucas*, 2007 WL 1575231, at *8 (M.D. Pa. May 31, 2007).

In the instant case, a reasonable period of discovery did not occur inasmuch as

Defendants responded to Santiago's Complaint by filing a motion to dismiss and for

summary judgment.  Moreover, Plaintiff filed two motions in this action in which he

attempted to ascertain the identity of John Doe.[5]  While the filing of motions is not the

proper procedural method to ascertain John Doe's identity, in doing so, Plaintiff at

least demonstrated that he made the attempt to obtain this information.  Therefore,

Defendants' motion will not be granted with respect to the dismissal of John Doe as a

party, and Santiago will be given an opportunity to ascertain his identity through

discovery.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss and for summary

---

[5]These motions (Record documents nos. 34, 44), which were filed after Defendants filed the instant motion to dismiss and for summary judgment, are disposed of in a separate Memorandum.

judgment will be denied.  In addition, a three (3) month period for conducting

discovery will be permitted.  After the discovery period ends, the matter will be set for

trial at the convenience of the Court.

     An appropriate Order will enter.


                                            s/ James F. McClure, Jr.
                                            JAMES F. McCLURE, JR.
                                            United States District Judge


                        IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARCOS SANTIAGO,                       :
                                        :
                Plaintiff,              :          CIVIL NO. 4:CV-08-0102
                                        :
           v.                         :          (Judge McClure)
                                        :

ASSISTANT WARDEN EY, *et al.*,    :
                                              :
                  Defendants.            :

## ORDER

April 10, 2009

**AND NOW,** in accordance with the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1.    Defendants' motion to dismiss and for summary judgment (Record document no. 28) is **DENIED**.

2.    The parties shall have three (3) months from the date of this Order within which to conduct discovery in this case.  At the conclusion of this time period, the matter will be set for trial at the convenience of the Court.

                                     s/ James F. McClure, Jr.
                                  JAMES F. McCLURE, JR.
                                  United States District Judge